1  exposure to excessive heat in his pre and post treatment custodial care

2  housing unit.

3  65.    On July 17, 2017, Ziemke noticed the CIM 2016 CCR regarding the

4  contaminated drinking water.  He noted that the Lead Action Level ("AL")

5  entry on the second page. At this time Ziemke experienced severe emotional

6  distress and depression because he was indigent and was forced to decide

7  on the coercive choice of continuing to consume the contaminated water and

8  risk disease and/or premature death or ask for a transfer, which would

9  most likely not be granted.

10  66.    On June 10, 2018, Ziemke noticed a CIM drinking water contamination

11  notice dated May 30, 2018, which was posted in the Laguna Hall (A-2)

12  bulletin board (see Ex.2).  Ziemke again experienced severe emotional

13  distress and depression because he was indigent and was again forced into

14  a coercive choice of continuing to consume the contaminated drinking water

15  and risk advanced disease and/or premature death or request a transfer

16  which would most likely be denied.

17  67.    On information and belief, CIM's contaminated water and lack of

18  equal cooling in the pre and post treatment custodial care housing units

19  has been causing premature death, advanced disease, injury, harm and

20  sickness for many years.  The CIM responsible staff members include, but

21  are not limited to: Warden Dean Borders, J.Core, B.Borilla, I.Morales,

22  J.Cavender, B.Casterena, T.Lee, K.Torres, M.Kerk, M.Dunlap and T.Lambert,

23  all intended to harm, injure, cause premature death and/or advanced disease

24  to Mr.Ziemke and all Defendants knew or should have known of the on-going

25  pain and suffering that all the Defendants are perpetrating on the disabled

26  HRM patients by continuing to deny equal access to bottled water already

27  provided to the women prisoners.

28        //

[Pg.34 of 74]

68.    As a result of the on-going forced consumption of known contaminated drinking water aka. physical abuse, including the discriminatory forced exposure to excessive custodial care heat, which Ziemke has been subjected to, Mr.Ziemke has experienced severe emotional distress and depression.

69.    During all times Mr.Ziemke has been in custody at CIM as a HRM patient, he has been subjected to all the discriminatory and illegal conditions of confinement. explained in Section IV., supra.

3.    JON GARY SCHNABEL (83½ years old)

70.    Jon Schnabel was transferred from MCSP to CIM on September 17, 2014, based on his HRM patient status.  On or about September 24, 2017, Schnabel was moved from CIM-C Facility to CIM A-Facility.  Upon being housed in Laguna Hall (A-2) Schnabel had safety concerns because the required ADA hand rails for the toilets and showers were not present nor planned to be installed.  Laguna Hall was also overcrowded, cramped with poor ventilation and has no ambient air cooling (fans only).

71.    On or about September 27, 2017, Schnabel was examined by CIM primary care physician Dr.Pollick, Schnabel's disability conditions include: Prostate surgery patient in 1969, currently he has on-going urinary pain from CIM's discriminatory policy of only providing male HRM patients with contaminated drinking water (Schnabel has no left Kidney, a birth defect); Coronary Heart Disease (treated at Pleasant Valley State Prison in 2010); Hearing impairment (tone deaf for the last 15 years) and he has a lower back injury (August 1990) for a past vehicle accident that left Schnabel mobility impaired.  He is currently classified as Mobility Impaired under the ADA and the Armstrong Remedial Plan.

72.    On information ad belief, on or about September 17, 2014, and thereafter, Schanabel's kidney problems have increased because of CIM's staff sanctioned policy of providing contaminated drinking water to

1  disabled HRM patients.  Since arriving at CIM Schnabel has been suffering

2  from skin lesions, rashes, and hives, which have increased in both size and

3  duration.  Schnabel has also suffered from new and on-going scalp lesions

4  both attributed to CIM staff policy to provide contaminated and substandard

5  drinking water to disabled HRM patients.

6  73.   On information and belief, CIM's contaminated drinking water has

7  been causing premature death; advanced disease, injury, harm and prolonged

8  and more frequent sickness for many years as far back as 2004.  CIM staff

9  members who engaged in an on-going conspiracy to advance the premature

10  death and on-going deadly afflictions include, but are not limited to:

11  Warden Dean Borders, J.Core, B.Borilla, I.Morales, J.Cavender, B.Casterena,

12  T.Lee, K.Torres, M.Kerk, M.Dunlap and T.Lambert, who all intended to harm,

13  injure, cause premature death, and/or advance disease to Joh Schnabel. All

14  knew, or should have known, of the on-going pain and suffering that all of

15  them are perpetrating on the disabled class of HRM patients.

16  74.   On or about July 17 and 25 2017, Schnabel had two heat episodes on

17  CIM C-Facility, both were diagnosed by Dr.Tran.  Schnabel could not walk

18  and was extremely dizzy.  In both heat episodes, Schnabel was taken in a

19  wheelchair to the C-Facility medical infirmary and cooled down in an air-

20  conditioned nurses station and provided with ice.  Schnabel has a

21  documented medical history of heat exhaustions/strokes going back to his

22  first heat stroke in September 1959 in the U.S. Army.  CIM A-Facility

23  Doctor Pollick is aware of Schnabel's dangerous heat sensitive condition

24  and continues to subject Schnabel to CIM's on-going policy of housing HRM

25  patients in substandard and unsafe pre and post treatment custodial care

26  living quarters with NO ambient air cooling (fans only).  Schnabel's

27  coercive choice is to continue to live at CIM by risking his life to pre-

28  mature death, or attempt to obtain a transfer to one of two other HRM

1  facilities (either MCSP or RJD) which both have ambient air cooling in the
2  custodial care housing units.  Because of CIM's on-going discriminatory and
3  illegal pre and post treatment custodial care housing, Schnabel has
4  experienced several heat exhaustion medical episodes, which could have been
5  fatal.  These episodes included weakness, lightheadness dizziness and
6  feebleness, all as a direct result of CIM's substandard, unequal and
7  illegal custodial care housing on both A and C-Facilities.

8  75.   As a result of CIM's policy to speed-up death and on-going sickness
9  by forcing consumption of known contaminated drinking water and other
10 direct physical abuse including the discriminatory and forced exposure to
11 CIM's custodial care excessive heat, which Schnabel continues to be
12 exposed to, Schnabel continues to experience severe and continuing
13 emotional distress and depression.

14 76.   During all times Mr.Schnabel has been in custody at CIM as a HRM
15 patient, he has been subjected to all the harmful, discriminatory and
16 illegal conditions of confinement explained in Section IV., supra.

17     4.  ESTATE OF BRUCE BROOKS – BRUCE KOKLICH AS ATTORNEY IN FACT
18 77.   Bruce Brooks was transferred to CIM on or about January 2015 and
19 was housed at A-Facility as a pre and post treatment custodial care HRM
20 patient.  Mr.Brooks was housed at Mariposa Hall and was employed in CIM's
21 food services unit as a dining room worker.  Brooks was 67 years old at the
22 time of his premature and wrongful death on November 17, 2017.

23 78.   Bruce's HRM medical conditions consisted of Arterial Heart Disease
24 and Liver Disease.  Mr.Brooks had a previous history of drug and alcohol
25 use.  He had been drug and alcohol free for 15 years in prison as supported
26 by multiple drug urine analysis tests.

27 79.   On or about October 10, 2017, Mr.Brooks was admitted to Riverside
28 Regional Medical Center for heart bypass surgery.  His surgery went well

1   and he was recovering nicely.  On or about October 24, 2017 Mr.Brooks was

2   released back to CIM as a post treatment custodial care HRM patient.

3   80.    On information and belief Mr.Brooks suffered pre-mature death from

4   the substandard, unequal and discriminatory post treatment custodial care

5   HRM patient housing conditions, which included providing Mr.Brooks with

6   contaminated drinking water during his post surgery custodial care.

7   Additionally, Mr.Brooks was housed in an uncooled 160 man overcrowded dorm.

8   The illegal and substandard conditions of confinement contributed to

9   Mr.Brooks' premature death, pain and suffering.  The following supervisory

10  CIM staff that are responsible for Mr.Brooks' pain, suffering and

11  premature death are: Warden Dean Borders, J.Core, B.Borilla, I.Morales,

12  J.Cavender, B.Casterena, T,Lee, K.Torres, M.Kerk, M.Dunlap, T.Lambert and

13  S.Almosara.  All intended to harm and did contribute to Mr.Brooks'

14  premature death by their failure to prevent post treatment custodial care

15  patients from consuming contaminated drinking water, as well as failing to

16  provide Elder Abuse Act HRM patients with equal ambient air cooling.  All

17  Defendants knew or should have known the imminent danger and death that

18  these deadly custodial care conditions of confinement inflect on all

19  recovering HRM patients.  Defendants failure to act in their supervisory

20  capacity caused or contributed to Bruce Brooks premature death.

21  81.    As a result of the discriminatory treatment and illegal conduct of

22  the above Defendants, Mr.Brooks did experience severe emotional distress and

23  depression.

24  82.    During all times Mr.Brooks was in custody at CIM, he was subjected

25  to all the conditions of confinement explained in Section IV, supra.

26  83.    Mr.Brooks is not currently in custody and, thus is not an inmate

27  with the meaning of the PLRA.

28      //

[Pg.38 of 74]

5. RONALD E. AUSTIN (71 years of age)

84.    Ron Austin was transferred from Pleasant Valley State Prison ("PVSP") to CIM an February 8, 2013, based on his Classification as a HRM patient and was housed in Joshua Hall on A-Facility.  Upon being moved to Laguna Hall he was immediately affected by particulate pollution in the air ducts including dust, soot, and other allergens that caused and continue to cause asthma and sinus problems.  The Laguna Hall bathroom facilities were and continue to be dirty, insufficient (not enough toilet and shower space/access) and overcrowded.

85.    In December 2012 Austin was examined by PVSP medical staff and diagnosed with coronary artery disease.  Because of this heat sensitive medical condition he was diagnosed to be a High Risk Medical patient.

86.    On multiple occasions between June 2017 and November 2017 as well as on July 6, 2018, he experienced multiple excessive heat episodes.  Because of his High Blood Pressure and Coronary Artery Disease, when the temperature exceeds 85° Mr.Austin becomes weak, lightheaded and is effected by the heat and sometimes does not leave his bunk area.  During these high heat episodes, CIM custody staff orders inmates in from the outside shade (where it is cooler) into the uncooled pre and post treatment custodial care Dorm, which is hotter and is a more dangerous environment for Mr.Austin and other HRM patients.

87.    On or about June 8, 2018 Austin read a "drinking water problem" notice that was posted on the Laguna Hall pre and post treatment custodial care housing unit bulletin board (Ex.2).  Austin noted that CIM Defendant I.Morales received notice (sample results) of the high level of contaminates on May 16, 2018, and then again on May 18, 2018, but failed to distribute Notice of the toxic levels of contaminates until May 30, 2018.  Austin did not see the Notice (Ex.2) until posted on June 6, 2018.

88.    As a result of the on-going forced consumption of known, but undisclosed contaminated drinking water, as well as on-going exposure to excessive custodial care heat, Austin has experienced severe emotional distress and depression.

89.    During all times Mr.Austin has been in custody at CIM as a disabled HRM patient, he has been subjected to all the discriminatory and illegal conditions of confinement explained in Section IV, supra.

    6.    CHRISTOPHER CAMP   (age 77)

90.    Christopher Camp is an inmate patient and resident at CIM. Currently Mr.Camp is housed as a pre and post treatment custodial care HRM patient on A-Facility.

91.    On October 27, 2015, Mr.Camp was transferred from Wasco State Prison to CIM.  Upon arrival at CIM Mr.Camp noticed that the A-facility medical facility lacked cleanliness as the light fixtures were laden with insect carcasses.  Mr.Camp was also discouraged because the medical examination area was not private and other inmates and custody staff could listen to the doctors conversation about confidential medical conditions.

92.    On or about July 15, 2016, Mr.Camp received the CIM CCR dated June 29, 2016 and noticed that there was a single Lead Action Level (AL) notation.  After noticing the AL Lead levels and other concerns including Hexavalant Chromium, which is way over the Public Health Goal, Mr.Camp started researching the water quality laws and obtaining copies of CIM CCR's and corresponding lab reports.

93.    In the week of July 7, 2018, CIM was experiencing hot weather. Mr.Camp had trouble sleeping because of the excessive heat, none of CIM A-Facilities eight pre and post treatment custodial care dormitories have any ambient air cooling (fans only). he was shocked at the number of elderly HRM patients that were crowded into old 1940's military barracks

1   with no regard to the danger and physical abuse that excessive heat
2   episodes cause to these elderly and at risk HRM patients, including pain
3   and suffering from frequent heat episodes.  During these heat episodes ice
4   water Cambros are brought into the overheated custodial care housing units
5   and then the disabled HRM patients are encouraged (over the public address
6   system) to hydrate (consume more contaminated water).
7   94.   On April 19, 2018, Mr.Camp sent a written request (see Ex.8, Camp
8   Dec. at Ex.A) regarding value errors for Barium in Table 4 of the 2015 and
9   2016 CCR's.  Mr.Camp's first request for this information was claimed to
10  be not received by CIM Chief Engineer I.Morales.  On May 4, 2018,
11  Mr.Morales responded to Mr.Camp's 2nd request and admitted that errors were
12  were true "Good Catch".  Mr.Morales also admitted that these errors took
13  place and were overlooked by two different State Civil Service employee
14  reviewer's including a professional Engineer.  Because of the errors, on
15  June 6, 2018, Mr.Camp requested copies of the outside vendor lab reports.
16  On July 24, 2018, Morales falsely responded that these lab reports "are
17  not considered Public Records" (See Ex.8 at Camp Dec. at Ex.A).
18  95.   On or about September 1, 2018 Mr.Camp was provided with CIM's Lead
19  and Copper compliance lab reports which were signed by CIM's Robert
20  Stockwell on September 27, 2016, and were reviewed by San Beranadino
21  County, State Water Resources Control Board engineer Eric Zuniga.  The lab
22  report conflicted with CIM's 2016 CCR as there were two Lead Action Limit
23  notations in the lab report and only one on CIM's CCR.  One of the two
24  Lead Action Limit notations was eight times the Action Limit and could be
25  comparable to the Flint Michigan drinking water crimes (see Ex.8, Camp
26  Dec. at Ex.C).
27  96.   On September 3, 2018, Mr.Camp requested an explanation from CIM
28  Chief Engineer I.Morales regarding the statutory basis for doing triennial

1   Lead and Copper testing when the Lead 90th percentile level consistently

2   exceeds 5 ppb. in all CIM CCR's (see Ex.1), which requires annual Lead

3   testing.  Morales responded on September 12, 2018 by falsely claiming that

4   "your questions are too involved " (see Ex.8, Camp Dec. at Ex.C).

5   97.   On October 11, 2018 at 11:00am Mr.Camp had a face to face meeting

6   with CIM WTP engineer I.Morales.  Mr.Camp and Mr.Morales discussed multiple

7   issues regarding CIM's reporting errors on the CCR's.  Camp stated to

8   Morales "when you stated in your July 24, 2018 response that 'lab reports

9   are not considered public records'" Mr.Camp then produced the lab reports

10  from the State Water Resources Control Board.  Mr.Morales seemed upset that

11  Mr.Camp had the ability to obtain the lab reports.  Then Mr.Camp went

12  further and stated to Morales "the Lead Action Limit notations that are

13  shown in on the September 28, 2016 Lead and Copper lab report are

14  comparable to the Lead levels reported in the Flint Michigan water

15  contamination crimes."  At this point Mr.Morales facial expression changed

16  to one of dismay and his skin color turned ashen.  During this conversation

17  Camp and Morales spoke several times about the California Institution for

18  Women ("CIW").  Camp reiterated multiple times that the women at CIW

19  continue to receive bottled water, which Morales never denied.  Camp also

20  confirmed that CIW's water supply service is through a $2\frac{1}{2}$ mile pipeline

21  delivered from CIM's water treatment plant.

22  98.   On October 11, 2018, at 11:30am, Mr.Camp continued his conversation

23  with Defendant I.Morales, and referred to the Sample Site showing 130 ppb.

24  for Lead, and Mr.Camp intentionally used the site location name as the

25  "Juice Plant" and never referred to it's lab report name "Dairy Office".

26  I.Morales never corrected Mr.Camp, and on information and belief the Dairy

27  Office and the Juice Plant are one and the same.  Additionally, Mr.Camp

28  brought to Mr.Morales attention the September 3, 2018 CDCR 22 request

1   regarding the statutory basis for annual vs. triennial Lead and Copper
2   testing.  Because Mr.Camp previous written response from Morales was "your
3   questions are too involved", Mr.Camp read the regulations on this rule, see
4   Title 22 § 64675.5(a)(1).  After Mr.Camp read the regulation verbatim,
5   documenting that after a 90th Percentile result above 5 ppb. the water
6   purveyor is precluded from triennial testing and must remain at least on
7   annual testing frequency.  Mr.Morales had no response after Mr.Camp
8   disclosed the rules and just shrugged his shoulders in dismay.
9   Additionally, Mr.Camp also brought up the fact that CIM was doing only 20
10  site samples per period.  Mr.Camp then read Title 22 § 64673(e)(2),  which
11  requires a return to 40 site samples per period, after the AL exceedance
12  in 2013.  After he documented another Lead test violation to Morales,
13  Morales had no response.
14  99.     November 15, 2018 Mr. Camp   met with CIM primary care physician
15  Dr.Vu related Mr.Camp's semi-annual High Risk Medical evaluation.  Mr.Camp
16  explained to Dr.Vu his concerns with the toxic levels of Lead in the water
17  at CIM; that A-yard had not been tested for Lead for  at least 6 years;
18  that the Lead levels at the Juice Plant tested at 130 ppb. (Flint Michigan
19  water crimes levels).  Dr.Vu refused to document the health concerns in his
20  medical file, replying "take it up with the Warden".  Mr.Camp then asked
21  Dr.Vu if he drank the water here, and Dr.Vu replied that "he did not".
22  Mr.Camp asked why, and Dr.Vu avoided the question and replied again "I
23  don't drink the CIM water".  Mr.Camp asked why not again and Dr.Vu again
24  stated "he did not drink the CIM water". Mr.Camp pressed for an answer and
25  asked Dr.Vu "why did he not answer the question" and Dr.Vu refused to
26  answer and said nothing.  Dr.Vu then stated that CIM water is the same as
27  City of Chino water.  Mr.Camp corrected Dr.Vu and let him know that CIM had
28  seven water wells, a Water Treatment Plant, a reservoir and a water tower

1  separate from Chino City Water.  Mr.Camp      documented that Dr.Vu failed

2  to record Mr.Camp's medical concerns about the high levels of Lead in the

3  post appointment confirmation form.

4  100.   As a result of the on-going forced consumption of contaminated

5  drinking water and other physical abuse including discriminatory excessive

6  custodial care heat that Mr.Camp has suffered from, Mr.Camp requests that

7  the Court take immediate remedial action.

8  101.   During all times Mr.Camp has been in custody at CIM as a HRM

9  patient, he has been subjected to all the discriminatory and illegal

10  conditions of confinement explained in Section IV, supra.

11        7.   BRUCE KOKLICH  (age 59)

12  102.   On June 13, 2013,  Mr. Koklich was transferred from Mule Creek

13  State Prison ("MCSP") to CIM A-Facility due to his HRM status.  Upon

14  arrival Mr. Koklich noticed the poor taste and smell of the CIM drinking

15  water and thus checked the bulletin boards in the Law Library, Education

16  Class Rooms, Cafeteria and the pre and post treatment custodial care

17  housing, for any water reports or contamination notices.  After finding

18  none Mr.Koklich was alarmed by the substandard condition of the pre and

19  post treatment custodial care housing units.  Mr.Koklich was disturbed

20  because the HRM patients should not be subjected to inadequate class-room

21  space, unsanitary and smelly porta potties, lack of sufficient computers,

22  tiny law library for 1100+ HRM patients, insufficient number of telephones

23  (two per each 160 man custodial care dormitory).  As of November 26, 2018,

24  A-Facilities custodial care housing units are overcrowded at between 180%

25  to 190% of design capacity.

26  103.   On or about May 15, 2018, Mr.Koklich spoke with CIM A-Facility

27  security and escort officer Correctional Officer C/O Knight regarding

28  information that A-Facility air conditioners/cooling units were to be

1  installed on all pre and post treatment custodial care housing units.

2  Officer Knight stated that "I observed them [eight cooling units] myself

3  when I was over at the supply house about 6 months ago". Mr.Koklich asked

4  Officer Knight why all the staff locations including education class rooms,

5  administrative offices, visiting room and C/O offices within each pre and

6  post treatment custodial care housing unit had air conditioning, but not

7  the HRM patient housing locations, C/O Knight replied "it is not right and

8  I have no idea when they might be installed".

9  104.    On or about May 15, 2018 Mr.Koklich was examined by CIM A-Facility

10  RN Mr.Cole, for Mr.Koklich's continuing symptoms of pneumonia (a week

11  earlier Mr.Koklich had been hospitalized for seven days with pneumonia) and

12  upon arrival back to Mr.Koklich's post treatment custodial care housing

13  unit, and drinking the contaminated water, Mr.Koklich appeared to be

14  relapsing with continued pneumonia symptoms including coughing and

15  weakness.  Nurse Mr.Cole stated upon arrival at the CIM infirmary, "you

16  came to the right nurse for pneumonia, I know alot about it, my father

17  just died from it." Mr.Koklich and Mr.Cole discussed breathing exercises

18  and the necessity for ample hydration.  I asked what he knew about the

19  contaminated CIM drinking water.  RN Mr.Cole stated "I have been a

20  correctional nurse for over 20 years and I have never seen a prison

21  provide non-pottable drinking water to HRM patients.  CIM's drinking water

22  is not pottable." RN Cole stated that "your only choices are to ask for

23  a transfer or buy bottled water from the canteen." Mr.Cole further checked

24  Mr.Koklich's lungs and his oxygen saturation level and stated that he would

25  not recommend more antibiotics and had no advice about the fact that Mr.

26  Koklich cannot afford bottled water nor has Mr.Koklich been able to obtain

27  a transfer.

28       //

105.   On June 5, 2018, at 2:30pm pre and post treatment custodial care housing officer C/O A.Varela asked Mr.Koklich to post the CIM Nitrate Contamination Notice dated May 30, 2018 (because Mr.Koklich is the custodial care housing clerk).  When Mr.Koklich spoke to C/O A.Verela about the late  contamination notice, Varela stated, "everyone knows not to drink CIM's bad drinking water, your only choice is to buy bottled water or ask for a transfer to another HRM facility."

106.   On June 18, 2018, at 5:10pm Mr.Koklich asked pre and post treatment custodial care housing officer C/O Green if he wanted me to post the CIM 2017 2017 Consumer Confidence Report ("CCR") on the Laguna Hall Bulletin Board (the 2017 CCR was sitting on the steel property locker in Green's air conditioned office).  Green stated "I don't drink the CIM water and I don't care what you do with the water report, if I were you, I would buy bottled water."

107.   On July 6, 2018, at 2:10pm Mr.Koklich verified with two different HRM patients (who had their own thermometers) that the interior temperature of Laguna Hall (a pre and post treatment custodial care housing unit) exceeded 100°.  The two patients who owned their thermometers are Donald Dellett (temperature 102° at 2:05pm, CDCR #AS-9872, bed # A2-177L) and Keith Carlen (temperature 101° AT 2:09pm, CDCR # J-84118, bed # A2-177 L.)

108.   On August 10, 2018, at 9:20am Mr.Koklich had a conversation with pre and post treatment custodial care housing officer C/O Ms.Brown regarding bottled water distribution at California Institution for Women ("CIW").  Mr.Koklich asked C/O Ms.Brown why are the women at CIM getting daily bottled water, but not the men at CIM?  Ms.Brown replied "I don't know why the women are, but the men are not, are you going to file a grievance?"  Mr.Koklich replied that because of the grievance retaliation at CIM, most likely not.

109.    On information and belief, CIM is the only pre and post treatment custodial care institution that aggregates it's HRM patients in hazardous housing that does <u>NOT</u> have ambient air cooling in each pre and post treatment custodial care housing unit.  Both MCSP and RJD aggregate HRM patients in their pre and post treatment custodial care housing units, all have ambient air cooling for their custodial care housing unit patients.

110.    On October 5, 2018 at 9:05am at CIM Laguna Hall (A-2) mini yard, Koklich had a conversation with correctional officer Ms.J.Alvardo, regarding Mr.Koklich's previous request regarding Ms.J.Alvardo's knowledge of California Institution for Women ("CIW") and it's policy of providing bottled water to the CIW female prisoners.  Ms.J.Alvardo stated to Mr.Koklich "I did check into the bottled water situation at CIW", Mr.Koklich then asked, "does CIW still provide bottled water to the female inmates?" Ms.J.Alvardo replied, "yes, they are still on bottled water." Koklich responded "why do the CIW females get bottled water and the CIM males do not?" Ms.J.Alvardo replied, "I am not sure why CIW gets bottled water and CIM does not." Mr.Koklich thanked Ms.J.Alvardo for the information.

111.    As a result of the on-going forced consumption of contaminated drinking water and other elder and custodial care abuse including discriminatory excessive heat that Mr.Koklich has been subjected to, Mr.Koklich has experienced severe emotional distress and depression.

112.    During all times Mr.Koklich has been in custody at CIM as an HRM custodial care patient, he has been subjected to all the discriminatory and illegal conditions of confinement explained in Section IV, supra.

        8.   GEORGE JACKSON  (age 57)

113.    George Jackson was transferred from Valley State Prison ("VSP") to CIM on February 26, 2017, because of his HRM condition.  Upon arrival at

1  CIM Mr.Jackson was astonished by the deplorable and dilapidated condition

2  of CIM A-Facility (aka. A-yard).  The yard medical facility was run-down,

3  congested and inadequate.  The pre and post treatment custodial care dorms

4  were also dilapidated and overcrowded with no ambient air cooling (fans

5  only) to serve elderly HRM patients in their 60's 70's and 80's.  On

6  information and belief, the most senior veteran under CIM's custodial care

7  is 94 year-old  Fred  Knight  CDCR # P-99856.      Fred is not mobility

8  impaired like many other HRM and ADA disabled patients (many are veterans).

9  CIM A-Facility provides dependent care for numerous elderly custodial care

10  patients, many are wheelchair and walker bound.  There are 30+ ADA disabled

11  wheelchair patients and 25+ walker patients.  CIM also provides an inmate

12  ADA staff consisting of 30+ ADA workers (15 for the AM shift, and 15 for

13  the PM shift).  These ADA workers service the on-going needs of many

14  elderly dependant care HRM patients.  These same ADA workers are encouraged

15  to solicit volunteer ADA workers who will be the next in line for

16  employment as an dependant care ADA worker at 11¢ per hour.

17  114.    Shortly after Mr.Jackson arrived at CIM A-Facility he began drinking

18  CIM's contaminated water.  Shortly thereafter Mr.Jackson started

19  experiencing rashes that he never had before.  Mr.Jackson also began to

20  show symptoms of hives and boils that he never had prior to drinking CIM's

21  contaminated drinking water.  Additionally, Mr.Jackson's enlarged prostate

22  medical condition ("BPH") became worse and the CIM physician increased

23  Mr.Jackson's PBH medication.

24  115.    On information and belief, Mr.Jackson's new skin rashes, hives and

25  boils as well as the deteriorating medical condition of Jackson's BPH

26  diagnosis are the direct result of CIM's on-going provision of contaminated

27  drinking water.  Senior staff at CIM including Warden Dean Borders, J.Core,

28  B.Borilla, I.Morales, J.Cavender, B.Casterena, T.Lee, K.Torres, M.Kerk,

[Pg.48 of 74]

1  M.Dunlap and T.Lambert all are aware of the discriminatory and illegal

2  drinking water contamination and refuse to cease and desist from on-going

3  gender discrimination and will not provide bottled water to the men at CIM,

4  even though the women at CIW continue to be provided with bottled water.

5  116.    On July 24, 2018, Mr.Jackson suffered from heat exhaustion symptoms

6  including lethargy, weakness, fatigue and lightheadedness.  Mr.Jackson

7  informed custodial care staff regarding his symptoms and the officers

8  instructed Mr.Jackson to drink more ice water (known by staff to be

9  contaminated).  Regardless of what the CIM Heat Plan stipulates, or the

10 inaccurate heat logs claim, which are provided by staff, the CIM pre and

11 post treatment custodial care housing is unequal, discriminatory and in many

12 cases is much more deadly, because other HRM custodial care institutions

13 like MCSP and RJD both have ambient air cooling in their dependent care

14 housing units.

15 117.    On information and belief, senior staff including Warden Dean

16 Borders, J.Core, B.Borilla, T.Lee, K.Torres, T.Lambert and S.Almosara are

17 all aware that disabled CIM HRM inmates, including custodial care and

18 dependent care patients are being injured and harmed with on-going

19 suffering, some, like Plaintiff Estate of Bruce Brooks have suffered from

20 premature death, all because of the lack of ANY ambient air cooling in CIM's

21 pre and post treatment custodial care housing units, and Defendants

22 continue to refuse to correct it.

23 118.    Mr.Jackson has been recording daily heat logs on and off since 2017.

24 He has had multiple conversations regarding the daily heat logs with

25 multiple floor officers who work in Otay Hall (A-7).  Mr.Jackson

26 demonstrated to many floor officers, including officer Eckelson, how the

27 manner in which the officer takes the interior temperature reading on a

28 daily basis is inaccurate and results in substantially lower temperature

1   readings.  Based on Mr.Jackson's expert evaluation of the manner in which

2   the CIM heat logs are prepared by many different CIM floor officers, on

3   information and belief, the CIM A-Facility heat logs are inaccurate and

4   should be adjusted upward by at least 5° to 10°.

5   119.  As a result of the on-going forced consumption of contaminated

6   drinking water, CIM doctors and nurses have been emboldened to disregard

7   the rights of "Continued Positive Air Pressure" ("C-PAP") medical device

8   HRM users and force them to use the contaminated water in their C-PAP

9   medical device so that toxins will now be inhaled in a vapor form. On

10  November 16, 2018, Mr.Jackson was interviewed by CIM RN Miller regarding

11  a grievance filed to challenge CIM's failure to provide distilled water to

12  the C-PAP medical device users (approximately 70 C-PAP users are on

13  A-Facility).  The medical grievance hearing began by RN Miller falsely

14  stating "CIM facilitates water processed through a system known as Triple

15  Reverse Osmosis Purifying system.  Therefore no reason exists to provide

16  distilled water for C-PAP machines."  Mr.Jackson made it clear to RN Miller

17  that these statements are false ("a bunch of bull-shit") and asked if RN

18  Miller as aware that the CIW women were on bottled water.  RN Miller

19  responded "It is not my responsibility to fact check the information I am

20  giving you."  Mr.Jackson offered to provide water reports to RN Miller

21  (CIM CCR's and lab reports) documenting the seriously contaminated on-going

22  condition of CIM's water supply.  RN Miller responded "I don't think that

23  [review of water reports] will be appropriate, so I am not comfortable with

24  that".  Mr.Jackson informed RN Miller that he will be appealing the denial

25  to supply distilled water as recommended by the C-PAP medical device

26  manufacturer (Divilbiss Healthcare).

27  120.  As a result of the on-going elder abuse by forcing consumption of

28  contaminated water and physical abuse including discriminatory excessive

1   heat exposure that Mr.Jackson has been subjected to, Mr.Jackson has

2   experienced severe emotional distress and depression.

3   121.    During all times Mr.Jackson has been in custody at CIM as a HRM

4   custodial care patient, he has been subjected to all the discriminatory and

5   illegal conditions of confinement explained in Section IV, supra.

6              VI    EXHAUSTION OF ADMINISTRATIVE REMEDIES

7   122.    HRM pre and post treatment custodial care patients at CIM have

8   exhausted their administrative remedies (see Ex.1).  Harold Taylor the

9   Class Representative who exhausted the contaminated water discrimination

10  Claims filed his Class/Group grievance on February 27, 2018.  The

11  Class/Group grievance was received and issued a Log # of CIM-A-18-0051 on

12  February 28, 2018.  The First Level Appeal Response was issued on March 14,

13  2018.  Class Representative Taylor issued his 2nd level response on April

14  2, 2018, it was received by CIM appeals coordinator T.Ledford on April 4,

15  2018. On April 13, 2018 Ledford issued a false screening Notice in an

16  attempt to prolong the on-going pain, suffering and premature death of the

17  contamination victims.  On April 20, 2018 Taylor issued his second level

18  screening response.  On April 26, 2018 it was received by T.Ledford.  On

19  May 11, 2018, Defendant Warden Dean Borders issued his Second Level Appeal

20  response. On May 24, 2018, Class Representative Taylor issued his reply to

21  the Third Level of Appeals in Sacramento.  On August 15, 2018, Chief of

22  Appeals examiner M.Voong issued his Third Level Response denying the Class

23  appeal.  The contaminated water claim is properly exhausted as a Class

24  Action claim.

25  123.    Class Representative Ronald Austin filed his Class/Group grievance

26  for "on-going denial of housing cooling service to High Risk Medical ("HRM")

27  patients on April 30, 2018.  The Class/Group grievance was received by CIM

28  appeal coordinators on May 4, 2018.  The first level improper screening

1    notice was issued on May 9, 2018. Class Representative Austin responded

2    to the improper screening on or about May 12, 2018.  CIM appeal

3    coordinators issued a First Level Appeal response on June 6, 2018. On June

4    20, 2018 Class Representative Austin issued his First Level Response to the

5    Second Level Appeal coordinator at CIM on July 6, 2018.  Defendant Warden

6    Dean Border falsely denied the Class/Group grievance claiming that "due to

7    the significant cost associate[d] with the installation of air conditioning

8    units."  On August 7, 2018 Class Representative Austin issued the Groups

9    response to the Second Level denial and forwarded it to the Chief of Inmate

10   Appeals in Sacramento care of Chief M.Harden.  On August 13, 2018 Chief of

11   Inmate Appeals analyst E.Munguia confirmed receipt and processing of the

12   Third Level Group Appeal.  On November 8, 2018, Class Representative Austin

13   issued a CDCR Form 22 NOTICE documenting Exhaustion of Administrative

14   Remedies,providing NOTICE,  and  documented CDCR's statutory breach of the

15   timeliness of 15 CCR §3084.8(c)(3).  Pursuant to Andres vs. Marshall,

16   No.15-56057 (9th Cir. 2017) Defendants failed "to respond to Andres'

17   grievance within a reasonable time ment he was deemed to have exhausted his

18   administrative remedies within the meaning of the PLRA".  Defendants either

19   discarded the Third Level denial or they failed to respond within a

20   reasonable time to the Second Level review.  Both of which will achieve

21   exhaustion under federal authority.  The statutory time to respond is 60

22   days. As of the filing of this complaint the Appeals Chief still has not

23   responded, after written confirmation that he received the grievance, it

24   has been 112 days. Administrative remedies on Log # CIM-A-18-01197 are

25   therefore exhausted at the Third Level of Review by operation of law.

26   124.    The following plaintiff's are not in custody and are therefore

27   excused from exhausting remedies pursuant to the PLRA,  Jeff Sabino,

28   Richard Slaughter, Ralph Sanchez, Lawerance Howerton, Shawn Hill, and the

1    Estate of Bruce Brooks.

2    125.   On July 22, 2016, general class member Frank Rust sent a letter to

3    J.Lewis, Deputy Director of Policy and Risk Management Services, California

4    Correctional Health Care Services, identifying systemic and on-going

5    discrimination against CIM inmates identified in this complaint,

6    identifying remedies Mr.Rust believed were necessary, and inquiring whether

7    the State was interested in attempting to negotiate a resolution of the

8    issues raised in the letter (see Ex.13).  Director Lewis never responded

9    to the letter and was therefore not interested in a meeting to discuss or

10   negotiate the claims.  Thus, Plaintiff's attempts to resolve the issues

11   through pre-litigation efforts were unsuccessful.

12                VII.   CLASS DEFINITIONS AND RULE 23 PREREQUISITES

13          A.   CLASS DEFINITIONS

14   126.   Plaintiffs bring this action on their own behalf, and on behalf of

15   various classes of all other persons similarly situated, pursuant to

16   Rule 23 of the Federal Rules of Civil Procedure.  There are four classes

17   alleged in this Complaint – two Federal and two California Classes.  They

18   are as follows:

19          a. The California Damages Class is composed of individuals who

20             currently are, were in the past (within six months prior to the

21             filing of Harold Taylor's Govt. Code § 910 claim), or will be in

22             the future (until such time as the unlawful policies and

23             practices cease or judgment is entered in this case), HRM

24             patients housed at CIM.  They bring their claims against various

25             individual Defendants as explained _infra_ in the causes of action

26             brought under California law.  They seek statutory damages of

27             $4,000.00 per violation for each Class member pursuant to

28             California Civil Code §§ 52.1(b) and 52 (Plaintiffs foresee two

1  violations per HRM patient,   one for the Toxic Tort

2  discrimination and one for the excessive heat discrimination).

3     b. The Federal Damages Class is composed of individuals who

4  currently are, were in the past (within two years of the filing

5  of this complaint) or will be in the future (until such time as

6  the unlawful policies and practices cease or judgment is entered

7  in this case), HRM patients housed at CIM.  They bring their

8  claims against all Defendants under 42 U.S.C. § 1983.

9     c. The California Injunctive Relief Class is composed of individuals

10  who currently are, or in the future without the intervention of

11  this court will be, HRM patients housed at CIM and subject to the

12  unlawful treatment set forth in this complaint.  They bring their

13  claims against Defendants CDCR, CIM and the individual Defendants

14  under California law.

15     d. The Federal Injunctive Relief Class is composed of individuals

16  who currently are, or in the future without the intervention of

17  this court will be, HRM patients housed at CIM and subject to the

18  unlawful treatment set forth in this complaint.  They bring their

19  claims against all Defendants under 42 U.S.C. § 1983.

20     B. NUMEROSITY

21  127.   In accordance with F.R.Civ.P. Rule 23(a), the members of each class

22  are so numerous that joinder of all members is impracticable.  Plaintiffs

23  do not know the exact number of class members.  There are approximately

24  850 HRM patients on CIM A-Facility and most likely another 600 on CIM

25  C-Facility.  The number of HRM patients on CIM D and B Facilities is not

26  known, and there is constant change and turnover in who is housed at CIM's

27  four facilities.  Plaintiffs are informed and believe, and thereon allege,

28  that the number of HRM patients in each of the proposed damages classes is

1  at least in the thousands, and that the number of persons in the proposed

2  injunctive relief Classes is higher given that it covers future HRM patients

3  patients housed at CIM.

4      C.   COMMON ISSUES OF FACT OR LAW

5  128.   In § IV of this Complaint, Plaintiffs set forth common factual

6  allegations for the mistreatment of HRM patients at CIM who comprise the

7  members members of each class, which allegations are incorporated into this

8  section of the Complaint.   In § V. of this Complaint, Plaintiffs set forth

9  factual allegations for the Named Plaintiff's regarding their treatment as

10  HRM patients at CIM, which are also incorporated into this section of the

11  Complaint.

12  129.   In accordance with F.R.Civ.P. Rule 23(a), there are questions of

13  fact common to the class.   The common questions of fact include, but are

14  not limited to the following:

15      a. Whether CDCR/CIM provides contaminated and substandard drinking

16          water to male HRM patients and allows CIW women inmates to

17          receive superior quality bottled drinking water (gender

18          discrimination).

19      b. Whether CIM Defendants knew or should known that HRM patients

20          were receiving dangerous or unequal or excessively contaminated

21          drinking water from CIM's Water Treatment Plant ("WTP") on

22          multiple and ongoing occasions.

23      c. Whether the high Lead levels (8 times the Action Limit)

24          documented in the September 28, 2016 lab reports are facts that

25          increase the number of Class members because the location of the

26          highly contaminated drinking water (the Dairy Office) is in

27          fact the CIM PIA Juice Plant, which used the contaminated water

28          to make juice which was distributed to thousands of non-CIM

1   Inmates.

2   d. Whether CIM intentionally over-prices it's canteen bottled water,

3      which is only available to non-indigent inmates because CIM staff

4      has been aware, for years, that CIM's drinking water is

5      excessively contaminated.

6   e. Whether lab provider Excelchem was properly terminated for cause

7      or were they retaliated against by CIM WTP staff for failing to

8      cover-up dangerous contamination exceedances and/or reporting

9      violations.

10  f. Whether CIM WTP has a policy of delaying or declining issuance

11     and posting of mandated Tier 1 and/or Tier 2 contaminated notices

12     thereby denying substandard water quality information and

13     statutory notices of the on-going contamination .

14  g. Whether it is CIM's policy and procedure to provide funds and

15     expenditures for bottled water for staff and officers, but not

16     for HRM custodial care patients.

17  h. Whether it is appropriate for CIM WTP staff to take Monday water

18     quality samples "grabs" and not provide (intentionally hide) the

19     lab results of those grabs from the State Water Resources Control

20     Board.

21  i. Whether the State Water Resources Control Board allows CIM to

22     misrepresent the size of its water district as one with more than

23     33,000 people or more than 10,000 service connections so that

24     pursuant to the regulations CIM can review its lab reports before

25     providing them to the State Water Board.

26  j. Whether CIM water quality lab reports are in fact not public

27     records as claimed by Defendant I.Morales on July 24, 2018 (see

28     Ex.8 at Camp Dec. at Ex.A).

k. Whether HRM patients face the coercive choice of continuing to
drink CIM's contaminated drinking water but at a greater threat
to personal safety, or ask for a transfer to either MCSP or RJD
where they will have safe access to superior quality drinking
water (i.e. normal access to safe drinking water or stay at CIM
at greater risk and gender discrimination by being denied access
to bottled water like the women at CIW currently receive).

l. Whether HRM patients face the coercive choice of continuing to
be housed in CIM's non-ambient air cooled pre and post treatment
custodial care housing units at a greater risk of heat stroke,
heat exhaustion events and premature death, or choose to ask for
a transfer to another HRM custodial care housing location (MCSP
or RJD) which both have ambient air cooling systems (also
dangerous because transfers rarely happen).

m. Whether HRM patients in the past have been denied access to
ambient air cooling systems, when CIM, in the past, has received
funds from CDCR which were allocated to purchase cooling systems
and never installed the received systems.

n. Whether the three high volume exhaust fans in each A-Facility
custodial care building, which run 24 hours per day, prevent any
interior cooling because any cool air is exhausted and hot
exterior air is immediately sucked into each care unit.

130.   In accordance with F.R.Civ.P. Rule 23(a), there are questions of law
common to the Class.  Plaintiff's are informed and believe and thereon
allege, that the common questions of law include but are not limited to
the following:

a. Whether CIM has violated the equal protection rights of HRM
patients by intentionally providing male inmates (regardless of

[Pg.57 of 74]

1    HRM patient status) contaminated and substandard drinking water,

2    but currently provide bottled superior quality drinking water to

3    the female inmates at CIM.

4    b. Whether CIM has violated the equal protection rights of HRM

5    patients by intentionally providing substandard, unequal and

6    contaminated drinking water to CIM HRM patients, when MCSP and

7    RJD HRM patients currently receive superior quality drinking

8    water as admitted by CIM Chief Engineer I.Morales in the

9    exhausted CIM grievance on substandard water quality (Ex.1).

10   c. Whether CIM has violated the equal protection rights of HRM

11   patients by consistently failing to provide accurate CCR's;

12   failing to timely post and notify HRM inmates of numerous

13   substandard water quality events; failing to timely post and

14   notify HRM patients of Tier 1 and Tier 2 substandard water

15   quality events, violating numerous statutory and regulatory laws

16   related to lawfully maintaining a water treatment plaint.

17   d. Whether CIM has violated the equal protection rights of HRM

18   patients by providing uncooled, unequal and substandard pre and

19   post treatment custodial care housing that subjects HRM patients

20   to heat exhaustion, heat strokes and premature death caused by

21   excessive heat events when other HRM institutions provide ambient

22   air cooling for their HRM patients.

23   e. Whether CIM has violated the equal protection rights of HRM

24   patients by not following the written directives of CIM's own

25   Heat Plan that stipulates (see Ex.10 at Pg.3 ¶5) "institutions

26   with air-conditioned housing units are not required to transfer

27   IP's (inmate patients) placed on heat alert medications to a

28   different housing unit."  CIM does not have pre or post treatment

[Pg.58 of 74]

1    custodial care housing with air-conditioning on either A of C

2    Facilities (approximately 2400 inmates, 1600 are HRM).

3    f.   Whether CIM has violated the equal protection rights of HRM

4         patients and non-HRM inmates by advancing a Heat Plan policy

5         which instructs (HRM and Non-HRM) to hydrate with known

6         contaminated ice water during high heat episodes.

7    g.   Regardless of whether sub-paragraphs a-f,   above, constitute

8         violations of the equal protection of the law taken individually,

9         whether the overall treatment of HRM custodial care patients at

10        CIM violates their right to equal protection of the law under

11        the totality of circumstances.

12   h.   Whether the conduct described above constitutes an unlawful policy

13        or custom of Defendants.

14   i.   Whether any individual Defendant is entitled to qualified

15        immunity on the federal claims, or state law immunity on the

16        state law claims, for the practices complained of herein.

17   j.   Whether the conduct described above violates the equal

18        protection rights of class members under the California

19        Constitution Article I, §1, 7 and/or the Fourteenth Amendment

20        to the United States Constitution.

21   k.   Whether the conduct described above constitutes Toxic Tort or

22        Gender discrimination liability violating California Civil Code

23        § 52.1.

24   l.   Whether the conduct described above constitutes equal services

25        and program liability under the ADA in violation of 42 U.S.C.

26        § 12101 et seq.

27   m.   Whether the conduct described above constitutes Toxic Tort and

28        Physical Abuse liability under California's Elder Abuse Act in

[Pg.59 of 74]

1   violation of California's Welfare and Institutions Code

2   § 15600 et seq.

3   n.   Whether the conduct described above constitutes Medical

4       Condition discrimination in violation of California Civil

5       Code § 54 et seq.

6   o.   Whether the level of scrutiny under the applicable law is strict

7       scrutiny or heightened scrutiny or some other level of scrutiny;

8   p.   Whether there is a lawful justification for any of the

9       discriminatory and abusive treatment sufficient under the

10      aplicable level(s) of scrutiny.

11  q.   Whether class-wide statutory damages are available under

12      California Civil Code § 52.1, 52(a), 54, or Cal.Welf.&Inst.

13      Code § 15600 et seq.

14  r.   Whether class-wide statutory damages are available under the

15      Americans with Disabilities Act of 1990 > 42 U.S.C. § 12101.

16  s.   Whether presumed or general class-wide damages are available

17      under 42 U.S.C. §1983.

18  D.   TYPICALITY

19  131.   In accordance with F.R.Civ.P. Rule 23(a), the claims of the

20  representative Plaintiffs are typical of each Class.  All named Plaintiff's

21  were in CIM custody when they were subjected to unequal treatment as HRM

22  patients, which unequal treatment applied and applies to all HRM patients

23  housed at CIM as pre and post treatment custodial care wards.  Named

24  Plantiffs were all denied access to: equal and uncontaminated drinking

25  water; equal and accurate Consumer Confidence Reports ("CCR"); equal

26  quality bottled water, which the women inmates at CIW are currently

27  receiving; equal and safe access to housing unit ambient air cooling for

28  all HRM custodial care patients.  Plaintiffs were all treated differently

[Pg.60 of 74]

1    from HRM and non-HRM inmates at other HRM institutions (MCSP & RJD) and were

2    otherwise subjected to discriminatory treatment alleged in the Complaint.

3    132.    Thus, Named Plaintiffs have the same interests, and have suffered

4    the same type of damages as the Class Members.  Named Plaintiffs' claims

5    are based upon the same or similar legal theories as the claims of the Class

6    Members.  Each Class Member suffered actual damages as a result of

7    Defendants' discriminatory policies.  The actual damages suffered by

8    Plaintiff's are similar in type and amount to the actual damages suffered

9    by each class member.

10   133.    In accordance with F.R.Civ.P. Rule 23(a), the Named Plaintiffs will

11   fairly and adequately protect the interests of the class.  The interests

12   of the Named Plaintiffs are consistent with and not antagonistic to the

13   interests of the Class.

14   134.    E.    MAINTENANCE AND SUPERIORITY

15   134.    In accordance with Fed.R.Civ.P. Rule 23(b)(1)(A), prosecutions of

16   separate actions by individual members of the Class would create a risk

17   that inconsistent or varying adjudications with respect to individual

18   members of the class would establish incompatible standards of conduct for

19   the parties opposing the class.

20   135.    In accordance with Fed.R.Civ.P. Rule 23(b)(1)(B), prosecutions of

21   separate actions by individual members of the class would create a risk of

22   adjudications with respect to individual members of the class that would,

23   as a practical matter, substantially impair or impede the interests of the

24   other members of the class to protect their interests.

25   136.    In accordance with Fed.R.Civ.P. Rule23(b)(2), Plaintiffs are informed

26   and believe, and thereon allege that Defendants have acted on grounds

27   generally applicable to the class.

28        //

137.    In accordance with Fed.R.Civ.P. Rule 23(b)(3), the questions of law
or fact common the members of the class predominate over any questions
affecting only individual members, and this class action is superior to
other available methods for the fair and efficient adjudication of the
controversy between the parties.  The interests of class members in
individually controlling the prosecution of a separate action is low in that
most class members would be unable to individually prosecute any action at
all.  The amounts at stake for individuals are such that separate suits would
be impracticable in that most members of the class would not be able to find
counsel to represent them.  It is desirable to concentrate all litigation
in one forum because all of the claims arise in the same location i.e., the
County of San Bernardino.  It will promote judicial efficiency to resolve
the common questions of law and fact in one forum rather than in multiple
courts.  Because the discrimination alleged herein is systemic, it is
particularly well suited to resolution on a class basis, as the critical
questions in the case may be answered on a class wide basis.

138.    Plaintiffs do not know the identities of the class members.
Plaintiffs are informed and believe, and thereon allege, that the
identities of the class members are acertainable from CDCR/CIM records, in
particular the CDCR computer systems used to track and identify CDCR HRM
inmates.  Plaintiffs are informed and believe, and thereon allege, that the
CDCR computer records reflect the identites, including addresses and
telephone numbers, of the persons who have been in custody as HRM patients,
over what periods of time and where the class members were housed at CIM;
who are the deceased HRM members and contact information regarding the next
of kin and other information regarding the identities of the Class members.

139.    Plaintiffs know of no difficulty that will be encountered in the
management of this litigation that would preclude its maintenance as a class

1   action.   The class action is superior to any other available means to

2   resolve the issues raised on behalf of the classes.   The class action will

3   be manageable because so many different records systems exist from which

4   to ascertain the members of the class and to ascertain some of the proof

5   relevant to Plaintiffs' claims.   Liability can be determined on a class-

6   wide basis based on class-wide evidence because the Plaintiffs complain of

7   systemic and widespread discriminatory practices and policies.   Named

8   Plaintiffs and the class members are entitled to statutory damages under

9   state law, and to presumed damages under Federal law; and, in any event,

10   individualization or variability in damages is not a bar to a liability

11   certification based on common liability issues.

12   140.   In accordance with Fed.R.Civ.P. Rule 23(b)(3), class members must

13   be furnished with the best notice practicable under the circumstances,

14   including individual notice to all members who can be identified through

15   reasonable effort.   Plaintiffs are informed and believe that CDCR computer

16   records contain a last known address for class members and family  members

17   of deceased class members.   Plaintiffs contemplate that individual notice

18   be given to class members at such last known address by first class mail.

19   Plaintiffs contemplate that the notice inform class members of the

20   following:

21        A.   The pendency of the class action, and the issues common to the

22             class; and,

23        B.   The nature of the action; and,

24        C.   Their right to "opt out" of the action within a given time, in

25             which event they will not be bound by a decision rendered in the

26             class action; and,

27        D.   Their right, if they do not "opt out" to be represented by their

28             own counsel and enter an appearance in the case; otherwise, they

1    will be represented by the named Plaintiffs and their

2    counsel; and,

3    E.   Their right, if they do not "opt out", to share in any recovery

4    in favor of the class, and conversely to be bound by any

5    judgment on the common issues, adverse to the class.

6    141.   Plaintiffs restate and incorporate by reference each of the foregoing

7    and ensuing paragraphs in each of the following causes of action as if each

8    paragraph was fully set forth therein.

9    VIII. COUNT ONE – 42 U.S.C. § 1983 [EQUAL PROTECTION]
                    (ALL DEFENDANTS)

10   142.   Plaintiffs re-allege all the preceding and following paragraphs of,

11   and allegations in, this Complaint.

12   143.   The unequal treatment of HRM patients, based on gender and disabled

13   medical condition, as alleged herein, deprives them of the protections

14   afforded by the 14th Amendment's Equal Protection guarantee.   Therefore,

15   the Federal Damages Class Representatives and Class are entitled to damages,

16   and the Federal Injunctive Relief Class Representatives and Class are

17   entitled to injunctive relief, pursuant to 42 U.S.C. § 1983.

18   144.   The aforementioned acts of Defendants proximately caused Plaintiffs

19   to be deprived of their rights as stated above, thereby entitling the

20   Federal Damages Class Representatives and Class to damages in an amount to

21   be proven at trial, including punitive damages against the individual

22   defendants.

23   145.   The Federal Injunctive Relief Class Representatives and Class

24   currently subject to, and will continue to be subject to, absent the

25   intervention of this court, the unlawful treatment alleged herein and,

26   therefore, seek injunctive relief on behalf of themselves and the class of

27   similarly situated individuals as previously defined.

28        //

[Pg.64 of 74]

IX.   COUNT TWO – CAL. CIV. CODE § 52.1 (ALL INDIVIDUAL DEFENDANTS)

146.   Plaintiffs re-allege all the preceding and following paragraphs of, and allegations in, this Complaint.

147.   The Defendants interfered with the California Damages Class Representatives' and Class', and the California Injunctive Relief Class Representatives' and Class', rights to equal protection of the law under the California Constitution, as previously alleged, by threat, intimidation or coercion (including coercive choice).

148.   The aforementioned acts of Defendants proximately caused Plaintiffs to be deprived of their rights as stated above, thereby entitling the California Damages Class Representatives and Class to statutory damages as provided by Civil Code §§ 52.1(b) and 52(a) and/or actual damages in an amount to be proven at trial, and to punitive damages.

149.   The California Injunctive Relief Class Representatives and Class are currently subject to, and will continue to be subject to, absent the intervention of this court, the unlawful treatment alleged herein, and therefore, seek injunctive relief on behalf of themselves and the class of similarly situated individuals.

X.   COUNT THREE – VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990 (Against individual Defendants – 42 U.S.C. § 12101, et seq.)

150.   The ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a pubic entity, or be subjected to discrimination by any such entity" 42 U.S.C. § 12132.   The act defines "public entity" as "any State or local government and any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).   This language encompasses all facets